IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 08–0916-TUC-CKJ (GEE) |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| vs. | |
| BRITTANY ANNE SEIBEL, | |
| Defendant. | |

The District Court referred this case to the Magistrate for hearing on pretrial matters. Hearing on the defendant's Motion to Suppress [Doc 32] was held on June 9, 2009. Upon consideration of the evidence presented and the arguments of respective counsel, the Magistrate recommends the District Court, after its de novo review, deny the Motion to Suppress.

**CHARGE:**

The one count indictment charges that on June 21, 2008, the defendant possessed marijuana in violation of 21 U.S.C. §§841(a)(1) and (b)(1)(B)(vii).

The defendant argues the stop of the vehicle she was driving on June 21, 2008 was unreasonable and, therefore all evidence seized as a result of that stop should be suppressed.

1 **EVIDENCE:**

2 *Testimony of Kenneth Johnson, BPA*

3   Johnson testified he is familiar with State Route (SR) 85 which runs north from the
4 Lukeville POE to Why, AZ. It is only one lane in each direction. The distance from
5 Lukeville and Why is approximately 28 miles, and all but 4 or 5 miles of that part of the road
6 runs through the Organ Pipe National Monument Park which is mostly open desert.
7 Lukeville is "a really small town" occupied only by 15 U.S. Customs Officers. There are no
8 towns or cities between Lukeville and Why, and all of the exits on SR 85 in that area are
9 scenic routes through the national park. The population of Why does not exceed 50 people.
10 The area on SR 85 just north of the Lukeville is "very commonly used for smuggling." The
11 Lukeville POE is designated milepost 80 and the mile marker numbers decrease as one
12 travels north on SR 85.

13   On the evening of June 21, 2008, he was patrolling on SR 85 about 7-8 miles north of the
14 border. It was dark; there are no street lights in that area. It was a Saturday evening–around
15 8:30 or 9:30-- and traffic was "fairly light." He was in a marked service vehicle and had
16 stopped to check on a vehicle stopped alongside the road. The occupants were an older
17 couple who stated they were taking a break from driving; they acquiesced to his request to
18 look into their vehicle's trunk. As he was doing this he noticed three northbound vehicles
19 pass him traveling in tandem very closely–within 10 feet of each other's bumpers. He said
20 such driving is not typical in that area because it is a "wide open road, there's no reason for
21 them to be all clumped up." The defendant was driving a red SUV Nissan Armada between
22 two older pick up trucks. Johnson stated he was suspicious of the vehicles and decided to
23 follow them to get a better look at the Armada which he believed was being "protected" by
24 the two pickups. It took him about five to ten minutes to get back into his service vehicle
25 and catch up to the three vehicles. He got into the southbound traffic lane, turned on his
26 signal to indicate his desire to get between the Armada and the last pickup; however, the
27 driver of the last pickup initially would not yield to allow him to get behind the Armada.
28 Johnson testified this further aroused his suspicions because in his experience drivers will

- 2 -

1  usually "make way" for law enforcement vehicles. Johnson maintained his position –there
2  was no southbound traffic–and continued efforts to get behind the Armada. Eventually, the
3  last pickup "backed off" and Johnson was able to get behind the Armada.

Once he was behind the Armada Johnson noticed the tags were a fleet tag, suggesting it was a rental. He ran the license plate and, indeed, it was registered to a rental agency. At this time he was seven to ten feet from the Armada's rear bumper and noticed "silhouettes, square-shaped objects that would be immediately arousing my suspicion that it possibly could be marijuana bundles inside [the Armada]." Johnson testified that his service vehicle was modified so that it "definitely s[a]t higher than an Armada."

The fact the Armada was a rental was significant to Johnson because rental vehicles are commonly used by smuggling organizations. He further stated the Armada had a large back window which was "slightly tinted." He also testified that while he was following the Armada and before he activated his overhead lights it appeared the driver was nervous because she veered over to the shoulder. Once he and the Armada had stopped, Johnson exited his vehicle and he smelled the odor of marijuana as he walked forward toward the Armada.. As he approached he shined his flashlight into the Armada and saw bundles. The defendant would not turn off her engine, roll down her window, or open the door. He pulled his service weapon and ordered the defendant to shut the engine off and exit the vehicle.

Nine bundles of marijuana, weighing about 455 lbs., were found in the rear of the Armada. Exhibits 2 through 10 were introduced into evidence; these are copies of photos Johnson took of the Armada and marijuana bundles about 30 t0 40 minutes after the stop when the Armada had been towed or driven to the Ajo Border Patrol Station. With regard to those photos (Exhibits 8 and 10) of the marijuana inside the Armada, Johnson testified the contraband had not been moved before the photos were taken.

Upon consulting his report, Johnson testified he stopped the Armada at 9 p.m. at milepost 69 on SR 85. After he had secured the Armada and the defendant, Johnson radioed to other agents to try to locate the two pickups which had been traveling in tandem with the Armada but those vehicles were never located.

On cross-examination Johnson stated he had been on patrol duty on his own for only two months before the evening of June 21st. He was stopped at milepost 73 when he first observed the three vehicles traveling north in tandem at about 65 mph. Johnson testified the highway is "pretty straight"; however, there are some hills and curves where there are no passing lanes. He admitted he had not recorded the license number of the rear pickup truck, nor had he noted the color, make or model of either of the pickups. Johnson stated his headlights were "hitting the whole back of the [Armada]", but he didn't "know exactly where they were aimed." Exhibit 11 shows the marijuana bundles outside the Armada and Johnson stated most were painted black. He admitted that the photos of the Armada taken at the Border Patrol Station do not depict the conditions under which he observed it on SR 85. There was no southbound traffic on SR 85 that would have illuminated the inside of the Armada. Johnson admitted he was not certain that the square shaped objects he saw through the rear window of the Armada were marijuana bundles and not suitcases or some other square shaped objects.

*Testimony of Robert Beauzil, BPA*

He was on duty on June 21, 2008, and had contact with BPA Johnson at about 9 p.m. Beauzil was northbound on SR 85 when he pulled off the road to speak with Johnson as a vehicle he (Johnson) had just stopped was pulling away. While he and Johnson were speaking three northbound vehicles passed traveling close together–about a car length and a half to two car lengths apart. Beauzil stated there was no reason for the vehicles to be traveling so close because there was no other northbound traffic in the area. The first vehicle was a Ford or Chevy pickup, the second was a Nissan SUV of some type, and he could not recall the make or model of the third vehicle. Johnson stated to Beauzil that the vehicles seemed to be traveling together and indicated he was going to check them out. Johnson got into his service vehicle and drove after the vehicles. Beauzil was in his own service vehicle and followed Johnson "to back up a little bit." He confirmed that SR 85 is a known smugglers route. He stated he was about a half mile behind Johnson and did not see his

efforts to get behind the Armada. By the time he came upon Johnson, the Armada was already pulled over. Beauzil stopped his vehicle, got out and saw Johnson had his gun drawn. Beauzil drew his gun as he approached the Armada on the passenger side and asked the female driver to put her hands up and exit the vehicle. Beauzil stated the window was down and the engine still running. Beauzil stated he saw what appeared to be marijuana bundles in the back of the defendant's vehicle and the bundles were visible above the window line.

During cross-examination Beauzil stated he had not written a report regarding his involvement in the stop of the Armada, but had reviewed Johnson's report "back when it the report was made." He confirmed the Armada's rear windows were tinted. He saw no bundles when he initially observed the Armada passing his location.

Beauzil stated he did not smell marijuana until he was at the passenger side of the Armada and the passenger window was open at that time.

**DISCUSSION:**

The search and seizure of a motorist suspected of criminal activity is analyzed according to the framework set out in *Terry v. Ohio*, 392 U.S. 1 (1968). For a lawful investigative stop the officer must have a "reasonable suspicion supported by articulable facts that criminal activity "may be afoot'." *United States v. Sokolow*, 490 U.S. 1,7 (1989). In determining whether reasonable suspicion existed to justify an investigatory stop, a reviewing court is required to "look at the totality of the circumstances of each case to see whether the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal punctuation omitted). "In the context of Border Patrol [stops], the factors to be considered in determining whether 'reasonable suspicion' exists to justify stopping a vehicle include, but are not limited to: (1) characteristics of the area; (2) proximity to the border; (3) usual patterns of traffic and time of day; (4) previous alien or drug smuggling in the area; (5) behavior of the driver...; (6) appearance or behavior of passengers; (7) model and appearance of the vehicle; and (8)

officer experience." *United States v. Garcia-Barron*, 116 F.3d 1305; 1307 (9th Cir. 1997) (citing *United States v, Brignoni-Ponce*, 422 U.S. 873, 885 (1975).

Defense counsel argues that Johnson admitted that when he decided to stop the Armada he was "just speculating that the objects he saw in [back of the Armada] were marijuana or contraband....There are no specific articulable facts of any wrongdoing."

This court does not agree with this statement. First, it should be noted the case law does not require that a stopping officer must know with certainty that criminal activity is afoot before undertaking an investigatory stop. Of course, a mere hunch or guess will not justify an investigatory stop. Articulable facts are necessary to justify the stop and, contrary to the defendant's assertion, Johnson set forth several articulable facts that led to his decision to conduct an investigatory stop of the Armada. First was his observation that the three vehicles seemed to be traveling closely in tandem when there was little other traffic; this testimony was corroborated by Beauzil who was present with Johnson when the three vehicles passed their location. Johnson testified his past experience was that vehicles traveled in such a manner in an attempt to "protect" the load vehicle. This suspicion was bolstered when the third vehicle initially thwarted Johnson's attempts to get his marked service vehicle between it and the Armada. Johnson's suspicions were not allayed when the registration check revealed the Armada was a rental; he testified his experience is that smugglers use rental vehicles to avoid personal losses. Both Johnson and Beauzil testified that the area of SR 85 where the Armada was first seen is known to be used by smugglers.

Considering the factors listed by Johnson and analyzing them in the context of the "totality of the circumstances", this court concludes he had reasonable suspicion to conduct an investigative stop of the defendant's vehicle.

During his statements at the end of the hearing defense counsel argued that because officers had drawn their guns, pointed them at the defendant, and ordered her from the vehicle, the investigatory stop was elevated to a felony arrest and probable cause was required to justify the stop, not just reasonable suspicion. Because this issue had not been

briefed by the parties, the court directed defense to file a memorandum and the government to file a response.

Johnson testified that he stopped his vehicle behind the Armada and walked to the driver's side. When the driver would not comply with his request that she shut off the engine, roll down the window, and exit the Armada Johnson pulled his gun. Beauzil confirmed he stopped to assist Johnson and approached the Armada from the passenger side. He saw Johnson had his gun pulled and the Armada's engine was still running and the driver was still inside. Beauzil testified the Armada's window was rolled down, but he did not state which one. Beauzil stated he also pulled his gun and the driver acceded to his order to exit the Armada. .

The defendant does not concede the investigatory stop was valid, but argues that when Johnson pulled his weapon the investigatory stop was converted into an arrest which required probable cause. The defense correctly notes there are "a myriad of cases" wherein the courts have dealt with the issue of whether an officer's drawing his gun automatically transforms a permissible investigatory stop into an arrest. In considering this question in *Washington v. Lambert,* 98 F.3d 1181 (9th Cir.1996), the court noted, "There is no bright-line rule to determine when an investigatory stop becomes an arrest. Rather...courts consider the 'totality of the circumstances.'....As a result, we have held that while certain police actions constitute an arrest in certain circumstances, e.g., where the 'suspects' are cooperative, those *same* actions may *not* constitute an arrest where the suspect is uncooperative or the police have specific reasons to believe that a serious threat to the safety of the officers exists." *Id.* at 1185 (citations omitted).

It should be noted there was no evidence that Johnson pulled his gun as soon as he exited his vehicle, and there is nothing to contradict his testimony that he did not pull his gun until *after* the defendant refused to comply with his request to turn off the engine, roll down the window, and exit the Armada. This court concludes that the defendant's refusal to cooperate–especially with the request to turn off the engine–could have reasonably led

Johnson to fear either for his own safety or that the defendant would attempt to flee the scene. Therefore, his actions did not convert the investigatory stop into an arrest.

**RECOMMENDATION:**

In view of the foregoing, the magistrate recommends that the District Court, after its independent review of the record, **DENY** the defendant's Motion to Suppress. Any party may file objections within 10 days of being served with a copy of this Report and Recommendation. If objections are not timely filed, the party's right to de novo review may be waived. If objections are filed, the parties should direct them **directly** to the District Court **by omitting the magistrate's initials from the caption.**

This Report and Recommendation is being faxed to all counsel on today's date. The Clerk of the Court is directed to send a copy of this Report and Recommendation to all parties.

DATED this 30th day of July, 2009.

_____
Glenda E. Edmonds
United States Magistrate Judge