1 **WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| ) | No. CR 08-916-TUC-CKJ |
| vs. ) | |
| ) | **ORDER** |
| BRITTANY ANNE SEIBEL, ) | |
| Defendants. ) | |

On July 30, 2009, Magistrate Judge Glenda E. Edmonds issued a Report and Recommendation [Doc. # 47] in which she recommended that Defendant's Motion to Suppress Illegally Seized Evidence for Lack of Reasonable Suspicion [Doc. # 32] be denied. The magistrate judge advised the parties that they had ten days to serve and file any written objections to the Report and Recommendation. Defendant has filed an objection and requested oral argument. The government has filed a response. The Court declines to schedule this matter for oral argument.

*Report and Recommendation*

The magistrate judge set forth the factors to be considered in determining whether reasonable suspicion exists to justify stopping a vehicle in the context of Border Patrol stops: "(1) characteristics of the area; (2) proximity to the border; (3) usual patterns of traffic and time of day; (4) previous alien or drug smuggling in the area; (5) behavior of the driver...; (6) appearance or behavior of passengers; (7) model and appearance of the vehicle; and (8) officer experience." *United States v. Garcia-Barron*, 116 F.3d 1305; 1307 (9th Cir. 1997), *citing*

*United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975). The magistrate judge discussed the evidence presented at the hearing and concluded that Border Patrol Agent Kenneth Johnson had reasonable suspicion to conduct an investigative stop of the vehicle driven by Defendant Brittany Anne Seibel ("Seibel"):

> First, it should be noted the case law does not require that a stopping officer must know with certainty that criminal activity is afoot before undertaking an investigatory stop. Of course, a mere hunch or guess will not justify an investigatory stop. Articulable facts are necessary to justify the stop and, contrary to the defendant's assertion, Johnson set forth several articulable facts that led to his decision to conduct an investigatory stop of the Armada. First was his observation that the three vehicles seemed to be traveling closely in tandem when there was little other traffic; this testimony was corroborated by [Border Patrol Agent Robert Beauzil ("Beauzil")] who was present with Johnson when the three vehicles passed their location. Johnson testified his past experience was that vehicles traveled in such a manner in an attempt to "protect" the load vehicle. This suspicion was bolstered when the third vehicle initially thwarted Johnson's attempts to get his marked service vehicle between it and the Armada. Johnson's suspicions were not allayed when the registration check revealed the Armada was a rental; he testified his experience is that smugglers use rental vehicles to avoid personal losses. Both Johnson and Beauzil testified that the area of SR 85 where the Armada was first seen is known to be used by smugglers.
>
> Considering the factors listed by Johnson and analyzing them in the context of the "totality of the circumstances", this court concludes he had reasonable suspicion to conduct an investigative stop of the defendant's vehicle.

Report and Recommendation, p. 6. The magistrate judge also concluded that the agents' actions in drawing their guns, pointing the guns at Seibel, and ordering Seibel from the vehicle did not convert the investigatory stop into an arrest.

*Objections to the Report and Recommendation*

Seibel asserts that the magistrate judge failed to evaluate all of the evidence in the same light when considering the totality of the circumstances. Specifically, Seibel asserts that Johnson intended to stop Seibel's vehicle from the first contact he made (observation of three vehicles), even though Johnson did not know most of the information used to make his stop until after he had singled out Seibel's Armada with the intent to stop it on a hunch. Furthermore, despite the apparent suspected conspiracy, Johnson completely ignored the first vehicle he approached.

Seibel also objects to the magistrate judge's failure to report all of the evidence with the same objectivity when relating to articulable facts to support a finding of reasonable suspicion. Seibel asserts that a key issue was whether Johnson could actually see into the rear window of the Armada due to the lack of any lighting in the remote desert area and the tinting of the windows. Seibel points out that, while the Report and Recommendation accurately reflects Johnson's assertion that the Armada's window tinting was "light," Beauzil's testimony on cross-examination that the windows were "dark" was not accurately reflected in the Report and Recommendation.

*Totality of the Circumstances*

The Fourth Amendment prohibition against unreasonable searches and seizures extend to brief investigatory stops of persons or vehicles. *Terry v. Ohio*, 392, US. 1, 9 (1968). An investigatory stop "must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981). This "reasonable suspicion" must consist of specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity. *Cortez*, 449 U.S. at 416-18.

The Court must determine, therefore, whether Johnson had reasonable suspicion to conduct an investigatory stop of Seibel. The United States Supreme Court has stated that a "determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 277 (2002). In *Arvizu*, the Court specifically stated that an approach that evaluates and rejects numerous factors in isolation from other factors does not take into consideration the totality of circumstances. 534 U.S. at 274. Reasonable suspicion may not be "based on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped." *United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1121 (9th Cir. 2002); *United*

*States v. Rodriguez-Sanchez,* 23 F.3d 1488, 1492 (9th Cir. 1994), *overruled in part on other grounds.*

As stated by the magistrate judge, the United States Supreme Court "has identified a non-exclusive set of factors that may be considered in determining whether reasonable suspicion exists: (1) characteristics of the area in which a vehicle is encountered; (2) proximity to the border; (3) usual traffic patterns on the particular road; (3) [sic] previous experience with alien traffic; (4) recent illegal border crossings in the area; (5) erratic or evasive driving behavior; (6) aspects of the vehicle; and (7) the behavior or appearance of the driver." *United States v. Diaz-Juarez,* 299 F.3d 1138, 1141 (9th Cir. 2002) *citing Brignoni-Ponce*; *see also United States v. Hernandez-Gonzalez,* 608 F.2d 1240 (9th Cir. 1979) (factors considered: not close to the border, but on a road used to bypass a checkpoint; "heavy" ride of one car; two cars traveling in tandem); *United States v. Chavez-Valenzuela*, 268 F.3d 71(9th Cir. 2001) (although nervousness is a factor, it alone is insufficient).

Despite the factors identified by the magistrate judge as supporting a finding of reasonable suspicion, Seibel asserts consideration of the facts that Johnson intended to stop Seibel's vehicle as soon as he saw the vehicle and Johnson ignored the first vehicle he approached is appropriate.[1] Seibel also asserts that the discrepancies regarding the darkness of the window tinting was not adequately considered by the magistrate judge. During the hearing on the Motion to Suppress, Johnson testified as follows:

> A (Johnson): . . . I saw the vehicles pass by and I just noted to Agent Beauzil something didn't look right; that a vehicle arouse my suspicion and I told Agent Beauzil, I'm going to go investigate further.

---

[1] The Report and Recommendation included these circumstances in its factual recitation. Seibel's assertion that, simply because the magistrate judge did not specifically discuss these circumstances in her legal analysis, she did not consider all of the circumstances is conclusory. Additionally, the Court notes that Johnson testified that his priority was the middle vehicle.

- 4 -

Transcript of 6/9/09 Hearing ("TR"), 32:4-7. Johnson further testified:

> Q (Healey): Okay. Now, after this – what you described as a tandem of cars drove past your position, what did you do next?
>
> A (Johnson): It immediately aroused my suspicion. The vehicles just didn't seem to fit together. It – it looked like pretty much the two trucks were protecting the Armada. So I – I decided that I was going to follow the vehicle and attempt to – just to get a better look at it, follow it north.

TR, 15:10-16. Johnson further testified:

> Q (Healey): Now, had you been talking with Agent Beauzil when the vehicles passed by?
>
> A (Johnson): Yes, sir. Agent Beauzil would have – we – we – I saw the vehicles pass by and I just noted to Agent Beauzil something didn't look right; that a vehicle aroused my suspicion and I told Agent Beauzil, I'm going to go investigate further.

TR, 32:2-7. Johnson also testified regarding the drive to catch up to the vehicles and how he then ran the plates of the Armada. Johnson then testified:

> Q (West): You make some mention of a checkpoint up ahead.
>
> A (Johnson): Yes, sir.
>
> Q: That would have been what, milepost 65?
>
> A: No, sir. The checkpoint is located at milepost 18.
>
> Q: 18?
>
> A: Yes, sir.
>
> Q: So that's past the intersection of Why, correct?
>
> A: Yes, sir.
>
> Q: That fit into your determination to check out the Armada at that point in time?
>
> A: I – I don't understand the question.

| | | |
|---|---|---|
| 1 | Q: | Well, what's the relevance of a checkpoint at milepost 18 in terms of your stop |
| 2 | | of the Armada? |
| 3 | A: | I just was trying, I guess, highlight the typical method they're using, why they're |
| 4 | | backpacking – why they have backpack straps on them. |

TR, 41:20-25-42:1-10. Contrary to Seibel's assertion, the Court does not find any basis to conclude that Johnson decided to stop Seibel's vehicle from the first contact he made (observation of three vehicles). Rather, Johnson's testimony is that, after observing the vehicles, he wanted to investigate. Moreover, when counsel asked Johnson regarding his "determination to check out the Armada at that point in time[,]" Johnson testified that he did not understand the question. TR, 42:3-5. Counsel for Seibel did not ask Johnson about his intent and has failed to point to any testimony that supports a conclusion that Johnson intended to stop Seibel's vehicle all along.

Johnson also testified as follows:

| | | |
|---|---|---|
| | Q (Healey): | . . . Now, on the evening of the 21st, what was the visibility like that evening? |
| | A (Johnson): | I – it was – it was dark that evening. I don't recall if there was a moon or anything like that. |

TR, 11:22-25. Johnson further testified:

| | | |
|---|---|---|
| | Q (Healey): | Now, back to this vehicle that – the Armada that you pulled behind. Could you describe the windows on the vehicle? |
| | A (Johnson): | The Armada had a large back window with a mild tint. It wasn't blacked out, it was tinted slightly. |

TR, 19:17-20. Beauzil testified as follows:

| | | |
|---|---|---|
| | Q (West): | Did you see tinted windows in the back of that car? |
| | A (Beauzil): | I -- no, I don't recall, no. |
| | Q: | They were dark tinted windows, weren't they, when you pulled up next to it? |

| | | |
|---|---|---|
| 1 | A: | Yes, when I pulled up, yes, they were tinted windows, yes. |
| 2 | Q: | They were dark tinted, weren't they? |
| 3 | A: | They were tinted, but I -- I -- I don't know how dark they were, but they |
| 4 | | were tinted. |

TR, 72:2-10. Beauzil further testified:

| | | |
|---|---|---|
| 6 | Q (Savel): | Did the windows in the back of the Armada or the SUV, pardon me, that |
| 7 | | you assisted Agent Johnson with the occupants, did they seem unusually |
| 8 | | dark tint -- tinted? |
| 9 | A (Beauzil): | They were tinted, but I'm not sure about unusual. I -- |
| 10 | Q: | As an agent you -- you've seen other vehicles with tinted windows |
| 11 | | before? |
| 12 | A: | Yes, ma'am. |
| 13 | Q: | Would you consider them in the spectrum of dark to barely tinted, would |
| 14 | | you consider them to be darker than average? |
| 15 | A: | I would say they were – they were dark, but I'm not – I'm not sure what |
| 16 | | the average is. |

TR, 75:25-76:1-10. In light of the lack of specificity from Beauzil regarding the tinting of the Armada, the magistrate judge's failure to discuss this testimony does not gainsay her conclusions.

Additionally, while the Court does not disagree with Seibel that all circumstances must be taken into consideration, "the court must consider the facts available to the officer at the *moment of seizure*. *United States v. Smith*, 217 F.3d 746 (9th Cir. 2000), *citing Terry*, 392 U.S. at 21-22, *emphasis added*. At the time of the stop, Johnson had observed the three vehicles appear to be traveling in tandem when there was little other traffic and in an area known to be used by smugglers, Johnson testified that his past experience indicated this was an attempt to protect the load vehicle, and one of the vehicles had attempted to interfere with Johnson's attempt to get between it and the Armada. Further, Johnson's suspicions were not

1 allayed when the registration check revealed the Armada was a rental; he testified that, in his
2 experience, smugglers use rental vehicles to avoid personal losses. A consideration of the
3 totality of these circumstances warrants a conclusion that specific, articulable facts which,
4 together with objective and reasonable inferences, formed reasonable suspicion that the driver
5 of the vehicle (i.e., Seibel) was engaged in criminal activity. *Cortez*, 449 U.S. at 416-18.
6 Johnson's *supposed* intent when he first began to approach Seibel's vehicle does not provide
7 a basis to conclude that Johnson manufactured the specific, articulable facts that, at the
8 *moment of seizure*, support a finding of reasonable suspicion. Similarly, while the Court
9 considers that Johnson may have been less than thorough in investigating all three vehicles,
10 it does not change the conclusion that, at the *moment of seizure*, there was reasonable
11 suspicion for Johnson to stop Seibel's vehicle.

Additionally, Johnson's testimony that he observed silhouettes of square-shaped objects in the vehicle supports the conclusion that there was reasonable suspicion to stop the vehicle. Seibel, through evidence and arguments presented, has attacked the reliability of this testimony. Although photographs have been admitted into evidence, Johnson established during the hearing that the photographs did not reflect the lighting at the time of the stop. However, Johnson testified that he would not have been able to see into the vehicle without the headlights on Johnson's vehicle. TR 30:8-17. Johnson further testified:

> Q (West): Okay. Now, you testified that you don't know what part of the vehicle your headlights were striking on the Armada, correct?
>
> A (Johnson): Yes, sir, I don't know exactly where they were hitting.
>
> Q: And when you look at -- when you're following the Armada, you are interested in what the plates are, you could see those, those were adequately illuminated by your lights?
>
> A: Yes, sir, they were.
>
> Q: Okay. So your headlights were not aimed through the back window of the Armada, correct?

| | |
|---|---|
| A: | I -- I don't know that, sir. My headlights were hitting the whole back of the vehicle. I don't know exactly where they were aimed. |

TR, 43:14-25-44:1; *see also* pp. 29-30. Although Johnson could not pinpoint where the headlights landed on the Armada, the Court does not find this fact a basis to discount Johnson's observation of the silhouettes of the square-shaped objects. Rather, Johnson's recognition of the fact that it was the illumination by the headlights that allowed him to see into the back of the vehicle supports a conclusion that Johnson observed the silhouettes. Furthermore, in light of the photographs that show the tinting of the vehicle, although not at the scene of the stop, the Court finds Johnson's testimony that he was able to observe (with the assistance of the headlights) the silhouettes, to be credible.[2] The Court notes that, contrary to Seibel's assertions, the Court does not find as significant that the photographs are in black and white.[3]

Accordingly, IT IS ORDERED:

1. The Report and Recommendation [Doc. # 47] is ADOPTED.
2. Defendant's Motion to Suppress Illegally Seized Evidence for Lack of Reasonable Suspicion [Doc. # 32] is DENIED.

DATED this 10th day of September, 2009.

Cindy K. Jorgenson
United States District Judge

---

[2] The Court notes that it does not place significant weight on the photographs because they were not taken at the scene of the stop and were taken under different lighting. However, the Court does consider that the photographs show that silhouettes can be observed through the windows.

[3] The Court makes no statement regarding whether the failure to save/print color photographs constitutes a failure to preserve evidence, only that, in considering the tinting of the vehicle for purposes of this Order, the photographs adequately show the vehicle.